UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| R3 COMPOSITES CORPORATION, ) | |
| ) | |
| Plaintiff/Counter-Defendant, ) | |
| ) | |
| v. ) | CAUSE NO.: 1:16-CV-387-TLS |
| ) | |
| G&S SALES CORP., ) | |
| ) | |
| Defendant/Counter-Plaintiff. ) | |

**OPINION AND ORDER**

This matter comes before the Court on Plaintiff R3 Composites Corporation's Motion for Summary Judgment [ECF No. 37], filed on August 24, 2018. The Defendant, G&S Sales Corp., filed a response [ECF No. 45] on September 28, 2018. On October 12, 2018, the Plaintiff filed a reply [ECF No. 50] in further support of its Motion for Summary Judgment. The Defendant also filed a Motion for Hearing [ECF No. 49] regarding the Plaintiff's Motion for Summary Judgment.

**STATEMENT OF FACTS**

The parties' dispute centers around whether R3 breached an agreement to pay commissions to G&S for business that G&S procured on behalf of R3.

**A. Start of the Business Relationship Between R3 and G&S**

In 2001, Roy Carver founded R3 to custom mold fiberglass parts. Around 2010, R3 purchased property in Grabill, Indiana, which included several hydraulic presses located on the property. Carver bought the property with the intent to use the hydraulic presses to manufacture grain storage bins. Shortly thereafter, Carver reached out to Steven Stefani, an equipment broker, to either sell the hydraulic presses located on the property or to find potential customers for R3 in

need of molding work. Stefani and Carver had conversations discussing the potential to have Stefani act as a sales representative for R3 working on commission. Around the same time, Stefani was in communication with a former colleague, Mark Glidden, about joining him to find potential customers for R3's molding business. Glidden agreed to help Stefani procure business for R3.

Glidden and Stefani first discussed the possibility of incorporating a new company called G&S Sales Corporation.[1] Glidden and Stefani also discussed that any commission payments G&S earned would be split in half between Glidden and Stefani. Glidden ultimately expressed a desire to form his own company that would act as a subcontractor assisting G&S on its work for R3. Subsequently, Stefani's wife, Patricia Stefani, incorporated G&S Sales Corporation as the sole incorporator and as a 50% owner. Steven Stefani owned the remaining 50% of G&S.

On January 31, 2011, Glidden sent an email to Carver with a proposed written sales representative agreement between R3 and G&S. The language pertaining to the proposed sales commission arrangement stated that R3 would pay G&S a commission fee of 5% for any business G&S brought to R3. The parties did not enter into this proposed agreement.

**B.      Written Agreement**

On February 10, 2011, R3 and G&S entered into a Non-Disclosure Agreement ("NDA" or "Agreement"). Glidden signed the Agreement on behalf of G&S as "Managing Partner." The language pertaining to commissions states:

---

[1] According to Carver's deposition testimony, the "G" stands for Glidden and the "S" stands for Stefani.

12. General Business Agreements.

12.1 New Jobs. G&S will assist R3 in starting up new jobs sourced by G&S through the pre-production approval process until such approval is given by the client/customer.

12.2 Commission. *If G&S obtains jobs for R3, the parties will attempt to develop an agreement whereby G&S is paid a commission with a guideline being a 5% commission with the precise commission rate to be negotiated on a job-by-job basis.* A commission will also be paid for any and all extensions, renewals, subsequent phases or additional terms of any such job obtained by G&S for R3, the amount of which to be determined on a job-by-job basis. Any commissions to be paid to G&S in this Section 12.2 are predicated upon G&S fulfilling all of its obligations under this Agreement, including without limitation, those provisions of Sections 12.3 immediate [sic] following.

12.3 Existing Jobs. During the term of this Agreement and thereafter, G&S agrees not to interfere with any existing R3 jobs by attempting to transfer such work to other molders and this provision shall remain in place throughout the existence of any existing production contract and all extensions, renewals, subsequent phases or additional terms thereof.

13. Termination. Either party may, at any time, terminate this Agreement effective upon written notice to the other party. Notwithstanding such termination, the obligations of each party as set forth in Section[ ] . . . 12 of this Agreement shall survive termination of this Agreement.

(*See* Def.'s Mem. in Opp. to Mot. for Summ. J., NDA, Ex. 9, §§ 12-13, ECF No. 47–11 (emphasis added).)

## C.     Aquatic Bath Business

Before the Agreement was signed, Stefani raised the possibility of securing Aquatic Bath as a customer for R3's molding business. On June 8, 2011, Aquatic and R3 signed a purchase and sales agreement that required R3 to manufacture and sell certain Aquatic products.

As R3's Aquatic business was not as profitable as anticipated, G&S agreed to temporarily forgo sales commissions. In February 2012, G&S proposed limiting the Aquatic commission

3

payments to 10% of R3's profit from the Aquatic business until monthly sales reached $600,000, at which point the commission would be set to 5% of sales. R3 did not accept the offer.

After several months of back-and-forth, Stefani in June 2012 stated that he was interested in the "long term" and was willing to "figure something out" on the Aquatic business until the Aquatic business became more profitable for R3. A March 22, 2013, email chain between the parties appears to reference an agreement between the parties that G&S would be paid a commission of 3% on the Aquatic business when the monthly sales to Aquatic reached $600,000. (Def.'s Mem. in Opp. to Mot. for Summ. J., Ex. 18, ECF No. 47–20.)

**D.    R3 Hires Glidden as Plant Manager**

At some point during the R3 and Aquatic negotiations, Carver contacted Glidden to offer him a position as a plant manager at R3's Grabill location. R3 ultimately hired Glidden on June 1, 2011. Although Stefani expressed conflict of interest concerns with Glidden accepting the position while still working for G&S to procure business for R3, he eventually acquiesced to allow Glidden to take the role as a plant manager for R3.

**E.    Reductions to G&S Commissions**

In 2014, Aquatic approached R3 with an offer to provide R3 sheet molding compound (SMC) at no cost to mold Aquatic products. Aquatic represented that it would invoice R3 showing that R3 paid for the SMC and then credit R3 for the payment of those amounts from what Aquatic would pay R3 for its molding work. Carver subsequently spoke with Glidden about subtracting the SMC costs for the purposes of G&S' Aquatic commission. Glidden represented that R3 could subtract the SMC costs for the purposes of calculating G&S' commission.

When the new set of agreements between R3 and Aquatic were signed, Glidden sent an email to Stefani to inform him that G&S was "getting close to losing over half" of its

4

commission. On November 5, 2014, R3 sent an email to G&S indicating that new commission rates would go into effect in December 2014.

E.     **R3 Terminated Agreement**

On June 24, 2015, R3 sent G&S notice that it was terminating the Agreement effective immediately, pursuant to section 13 of the Agreement. R3 continued to pay sales commissions to G&S on all jobs with customers that G&S sourced before the termination of the Agreement, including for Aquatic. On July 10, 2015, G&S sent a letter to R3 to remind R3 of its obligation to continue to pay G&S commissions consistent with section 13, which explicitly stated that section 12 of the Agreement would survive termination.

F.     **Further Reduction to Commission Amounts**

Due to a reduction in profitability for the Trivector and Janesville Acoustics accounts for R3, which G&S had also sourced, Glidden decided to adjust the commission being paid to G&S on those accounts. Glidden instructed R3's CFO, Kirk Klein, to change the commission being paid to G&S. Instead of reducing the commission on the statements being sent to G&S, Glidden instructed Klein to reduce the sales figures to lower the commission rate G&S was to receive. Klein testified in his deposition that he believed Glidden had the authority to accept lower commission rates on behalf of G&S.

G.     **Attempt to Negotiate New Agreement**

Over the course of the next year, the parties attempted to negotiate a new sales representative agreement. Although G&S terminated its relationship with Glidden on September 2016, R3 and G&S continued their negotiations for a new agreement. Eventually, R3 stopped making commission payments to G&S. According to R3, its decision to stop paying commissions to G&S was based on G&S not soliciting new business for R3 and G&S not

sourcing new business since Glidden's termination. Conversely, G&S claimed that it had a right to commission payments under the Agreement for any profit R3 obtained in connection with a job for a customer so long as the customer was originally sourced by G&S.

**H.      Instant Action**

R3 filed the present lawsuit seeking a declaratory judgment that it had not breached any agreement, expressed or implied, with G&S in connection with the payment of commission. The Complaint [ECF No. 5] was originally filed in Allen Circuit Court. G&S removed the action to federal court on November 14, 2016, and filed its Counterclaims [ECF No. 3] for breach of contract and violation of the Indiana Sales Commission Act. On December 22, 2016, G&S filed Amended Counterclaims [ECF No. 10] adding a third count requesting declaratory judgment regarding R3's continuing obligations to pay future sales commissions to G&S.

On August 24, 2018, the Plaintiff moved for summary judgment on the following 13 issues:

(a) That the term "job" in Section 12 of the NDA clearly and unambiguously means production contract or purchase order.

(b) The term "job" in the NDA Section 12 clearly and unambiguously does not mean "part."

(c) That the term "job" in the NDA Section 12 clearly and unambiguously does not mean "customer."

(d) That the NDA only requires R3 to pay G&S commission if G&S (a) obtains a production contract or purchase order; (b) starts up the production contract or purchase order; and (c) takes the production contract or purchase order through the pre-production approval process until the customer approves the production contract or purchase order.

(e) That each purchase order issued by a customer of R3 is a new contract – not an extension, renewal, subsequent phase, or additional term of an earlier and already fulfilled purchase order.

(f) That G&S did not obtain a production contract or purchase order for which it would be entitled to a commission from R3 since September 9, 2018.

(g) That G&S has not obtained an extension, renewal, subsequent phase, or additional term of any production contract or purchase order for which it would be entitled to a commission from R3 since September 9, 2018.

(h) That R3's obligation to pay a commission to G&S only survives the NDA's termination if G&S continues to fulfill its obligations under the NDA by obtaining production contracts or purchase orders; by starting up production contracts or purchase orders; and by taking the parties through the pre-production approval process until the customer approves the production contract or purchase order.

(i) That Mark Glidden ("Glidden") had the authority to act on G&S's behalf.

(j) That Glidden had the authority to negotiate commission rates on orders obtained by G&S for R3 on an order-by-order basis.

(k) That liability under the Indiana Sales Commission Act ("Act") cannot be predicated on commission reductions or agreements to which Glidden, as a representative of G&S, agreed.

(l) That a bad faith claim under the Act cannot be predicated on commission reductions or an agreement to which Glidden, as a representative of G&S, agreed.

(m) That, in the alternative, the NDA is an illusory agreement because it lacks sufficient definiteness to be enforced; that the parties had only an oral contract for the payment of commissions on orders obtained by G&S for R3; and that G&S is only entitled to commissions

on purchase orders obtained by G&S for R3 before September 9, 2016. (*See* Pl.'s Mot. for Summ. J.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Additionally, a court is not "obliged to research and construct

legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

## ANALYSIS

A. **Non-Disclosure Agreement**

Although the parties devote much of their briefing to whether R3 breached the NDA and their respective interpretations of the NDA, R3 argues in the alternative that if the Court should find the NDA illusory due to indefiniteness, then the Court should also find that R3 did not breach any oral contract or implied contract with G&S. Therefore, at the outset, the Court must decide whether the NDA is illusory and unenforceable due to indefiniteness.

The existence of a contract is a question of law. *Jernas v. Gumz*, 53 N.E.3d 434, 445 (Ind. Ct. App. 2016). For a contract to be enforceable, it "must be reasonably definite and certain in its material terms so that the intention of the parties may be ascertained." *Wenning v. Calhoun*, 827 N.E.2d 627, 629 (Ind. Ct. App. 2005). In other words, the parties must demonstrate the "intent to be bound and definiteness of terms." *Wolvos v. Meyer*, 668 N.E.2d 671, 675 (Ind. 1996) (quoting 1 Arthur Linton Corbin & Joseph M. Perillo, Corbin on Contracts § 2.8 at 131 (rev. ed. 1993)) (citing Restatement (Second) of Contracts § 33 cmt. f (1979) ("[p]romises may be indefinite. . . . The more important the uncertainty, the stronger the indication is that the parties do not intend to be bound.").

Courts in Indiana provide that for a contract to be sufficiently definite, "amounts and prices must be fixed, or be subject to some ascertainable formula or standard." *Inman's Inc. v. City of Greenfield*, 412 N.E.2d 126, 129 (Ind. Ct. App. 1980) (citing *Marshall v. Ahrendt*, 332 N.E.2d 223 (Ind. Ct. App. 1975). "In the end, the contract must provide a basis for determining

the existence of a breach and for giving an appropriate remedy." *McLinden v. Coco*, 765 N.E.2d 606, 613 (Ind. Ct. App. 2002) (internal quotation marks omitted).

The Court finds that the NDA in this case to be an illusory, unenforceable contract. The NDA states in relevant part: "If G&S obtains jobs for R3, the parties will attempt to develop an agreement whereby G&S is paid a commission with a guideline being a 5% commission with the precise commission rate to be negotiated on a job-by-job basis." (Def.'s Ex. 9, §12.2.) The NDA does not detail the commission rate R3 would be obligated to pay or detail some ascertainable formula to arrive at a commission rate R3 would be obligated to pay. Instead, the NDA is explicit about providing the parties the chance to attempt to negotiate a commission rate in the future. Consequently, even if the Court were to find that R3 breached the NDA, the Court would not only be unable to derive any remedy from the terms of the Agreement, but also, the Court would be unable to fashion a remedy consistent with a material term of the Agreement—namely, allowing the parties to negotiate a commission rate in the future.

Moreover, the Court will not find at this stage that the NDA binds the parties on the issue of whether G&S is entitled a commission when the relevant language evidences that the parties did not intend to be bound. Illustration 8 in §33 of the Restatement (Second) of Contracts speaks to this very issue.[2] The Restatement provides: "A promises to do a specified piece of work and B promises to pay a price to be thereafter mutually agreed. The provision for future agreement as to price strongly indicates that the parties do not intend to be bound." Restatement (Second) Contracts §33, cmt. e, illus. 8 (1981). Similar to the illustration in the Restatement, G&S promised to procure business for R3 and R3 promised to *attempt* to develop an agreement to pay

---

[2] Courts in Indiana cite to § 33 of the Restatement (Second) of Contracts as authority in cases where a contract's unenforceability due to indefiniteness is at issue. *See, e.g.*, *Wolvos*, 668 N.E.2d at 675; *McLinden*, 765 N.E.2d at 613.

10

G&S a commission at a price to be thereafter mutually agreed. In fact, the agreement to agree in this case is more indefinite and illusory than the Restatement's illustration. In the Restatement's illustration, B promised to pay A for the work that it had done although the price would be determined at some later date. In the present case, the Agreement did not even explicitly obligate R3 to pay commission; the Agreement only provided the parties would attempt to develop an agreement to pay commissions. Hence, the NDA is an illusory, unenforceable contract as its language evidences that the parties did not intend to be bound on the important issue of commission payments.

### B.     Implied Agreement or Oral Contract

R3 argues that in the event the Court finds the NDA unenforceable, the Court should then find that R3 did not breach any oral or implied contract to pay G&S commission.

As a preliminary matter, it appears that R3 has used the terms "implied contract" and "oral contract" interchangeably in this litigation. The Court understands this to be the case because R3 pleaded it had not breached an "implied agreement" in its Complaint while asking the Court to find it had not breached an oral contract in its Motion for Summary Judgment. To clarify, under Indiana law, "[e]xpress and implied contracts are very similar. They differ only in that an express contract is evidenced by spoken or written words while an implied contract is evidenced by the conduct of the parties." *DiMizio v. Romo*, 756 N.E.2d 1018, 1024 (Ind. Ct. App. 2001) (citations omitted); *see also Indianapolis Real Estate Bd v. Wilson*, 98 N.E. 400, 404 (Ind. App. Ct. 1933) ("The intention of the parties, in an express oral contract, is evidenced by words. The intention of the parties, in an implied contract, is evidenced by acts, circumstances, and implications.").

Regardless of whether R3 asks this Court to find an oral contract or implied contract, R3 fails to present argument supported by evidence regarding the existence of either. R3 has presented no argument demonstrating that an implied contract existed through the conduct of the parties—much less the terms of such an implied contract that would allow the Court to determine whether a breach occurred. Similarly, R3 presented no argument evidencing that the parties entered into a valid oral contract—much less the parameters of such an oral contract that would allow this Court to determine whether a breach occurred. Therefore, because the parties have neither demonstrated the existence of an implied or oral contract nor provided the specific terms of an implied or oral contract, this Court will not grant summary judgment on whether such an implied or oral contract existed nor whether such an implied or oral contract was breached.

C.  **Glidden's Apparent Agency**

R3 also moves this Court to find that Glidden had the authority to bind G&S to the commission rates that he negotiated with R3 through the principle of apparent authority. The Court finds that a genuine issue of material fact exists as to whether Glidden had authority to bind R3.

An agent has apparent authority to bind a principal when the third party in question reasonably believes the agent possesses authority due to some act by the principal. *Scott v. Randle*, 697 N.E.2d 60, 67 (Ind. Ct. App. 1998). An agent who is placed in a position to act and make reasonable representations is sufficient to cloak the agent with apparent authority to bind the principal. *Mendard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206 (Ind. 2000). There must be "some form of communication, direct or indirect, by the principal, which instills a reasonable belief in the mind of the third party" that the agent has the authority to act on behalf of the

principal. *AutoXchange.com, Inc. v. Dreyer & Reinbold, Inc.*, 816 N.E.2d 40, 48 (Ind. Ct. App. 2004). Statements or manifestations from the agent to the third party alone are not enough to create an apparent agency relationship. *Gallant Ins. Co. v. Isaac*, 751 N.E.2d 672, 676–77 (Ind. 2001). However, when a "party places an agent in the position of sole negotiator on his behalf, it may be reasonable for the third person to believe that the agent possesses authority to act for the principal." *AutoXchange.com, Inc.*, 816 N.E. at 48.

To prevail on summary judgment on the apparent authority issue, R3 must present evidence that Stefani's communications with R3 or Carver instilled a reasonable belief on the part of R3 and Carver that Glidden had apparent authority to bind G&S. *Isaac*, 751 N.E.2d at 676–77. R3, however, emphasizes that summary judgment on the issue of apparent authority is warranted in its favor by presenting evidence of R3's understanding of Glidden's authority based on Glidden's representations to R3. This is not enough to find that Glidden had apparent authority to bind G&S as statements or manifestations from the alleged agent are not alone sufficient to create apparent agency. *AutoXchange.com, Inc.*, 816 N.E. at 48.

It appears to the Court that R3 may be arguing that it was reasonable to believe that Glidden had the authority to bind G&S based on Stefani placing Glidden in the position of sole negotiator and representative for G&S. On the other hand, G&S has presented evidence that R3 knew Glidden did not have the authority to bind G&S to lower commission rates. For example, Carver testified that his discussions and negotiations with Glidden regarding commission payments were being relayed to Stefani, who Carver believed "was approving these things." (Pl.'s Mem. in Supp. of Mot. for Summ. J., Carver Dep., Ex. 1, 89–91, ECF No 39–1.) In the context of the commissions that R3 supposedly withheld from G&S due to problems with the

Aquatic business, Carver testified: "Every time we talked about these things, I always asked [Glidden] if he was communicating with [Stefani], and [Glidden] said yes." *Id.* at 92–93.

Therefore, a factfinder may reasonably conclude that instead of R3 having a reasonable belief that Stefani bestowed Glidden with authority to bind G&S, R3 had reason to believe that Glidden did not have the authority to bind G&S. Consequently, this Court denies summary judgment on the issue of whether Glidden had apparent authority to bind G&S. *See Bain v. Bd. of Trs. of Starke Mem'l Hosp.*, 550 N.E.2d 106 (Ind. Ct. App. 1990) (finding trial court erred in granting summary judgment on the issue of apparent authority when there was evidence supporting a reasonable factfinder deciding either way on the issue).

### D.     Indiana Sales Commission Act

R3 also moves the Court to find as a matter of law that it is not liable under the Indiana Wholesale Representative Commission Act (Act), Indiana Code § 24-4-7-5, for reducing commission payments to G&S.

The Act mandates that businesses pay their commissioned wholesale agents all accrued commission within fourteen days of termination of the principal-agent relationship. Ind. Code § 24-4-7-5(a). "A principal who in bad faith fails to comply" with that requirement "shall be liable, in a civil action brought by the sale representative, for exemplary damages in an amount no more than three (3) times the sum of the commissions owed to the sale representative." Ind. Code § 24–4-7-5(b).

The parties again put the carriage before the horse as they devote their arguments to discussing the proper interpretation of "wholesale" and whether R3 acted in bad faith without first defining the parameters of the agreement between R3 and G&S. As the Court explained

14

above, the NDA is unenforceable, and the parties have not defined the terms of an oral or implied contract, to the extent such a contract exists. Accordingly, the Court cannot decide at this summary judgment stage whether R3 is liable under the Act because the parties do not even define their respective obligations under their principal-agent relationship.

Hence, in sum, the Court grants summary judgment in favor R3 on the issue that the NDA is an unenforceable contract. The Court denies summary judgment on all other issues and claims.

## CONCLUSION

For these reasons, the Court GRANTS IN PART and DENIES IN PART the Plaintiff's Motion for Summary Judgment [ECF No. 37]. The Court DENIES the Defendant's Motion for Hearing on Summary Judgment [ECF No. 49]. By separate order, the Court will set a telephonic scheduling conference for purposes of scheduling the final pre-trial conference and trial.

SO ORDERED on February 27, 2019.

s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT